# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| VIDERAY TECHNOLOGIES, INC., a Delaware corporation, and TEK84, INC., a Delaware corporation, | ) ) ) ) |  |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 23-cv-13035-MJJ |
| VIKEN DETECTION CORP., a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) | |

---

## MEMORANDUM OF DECISION

September 30, 2024

JOUN, D.J.

Plaintiffs Videray Technologies, Inc. ("Videray") and Tek84, Inc. ("Tek84") (collectively, "Plaintiffs") bring a declaratory judgment action against defendant Viken Detection Corp. ("Viken") to determine claims of non-infringement and invalidity of Viken's patents, United States Patent Nos. 10,770,195 ("the '195 Patent"); 11,200,998 ("the '998 Patent"); and 11,776,706 ("the '706 Patent") (collectively, the "Patents at Issue"). [Doc. No. 1 at ¶ 1]. Additionally, Plaintiffs claim breach of a related settlement agreement ("the Agreement") and seek declaratory judgment that the Agreement bars infringement claims by Viken related to the Patents at Issue. [*Id*. at ¶¶ 2, 95-96].

On February 19, 2024, Viken moved to dismiss the First and Fourth Causes of Action as to Videray, as well as the Seventh and Eighth Causes of Action. [Doc. No. 16]. For the reasons set forth below, Viken's Motion to Dismiss is <u>GRANTED</u> in part and <u>DENIED</u> in part.

## I.    BACKGROUND

### A.    <u>The Parties and Patents</u>

Videray is a Delaware corporation with its principal place of business in Massachusetts. [Doc. No. 1 at ¶ 3]. It designs and develops portable and miniaturized handheld x-ray imagers, such as its PX1 and PX Ultra scanners ("the Accused Products"), which are used by law enforcement and others in the security industry. [*Id.* at ¶ 4].

Tek84 is a Delaware corporation with its principal place of business in California. [*Id.* at ¶ 5]. It likewise develops and manufactures security products for screening and surveillance, focusing on the use of ultra-low-dose x-ray imaging products. [*Id.* at ¶ 6]. Tek84 is a shareholder and investor of Videray. [*Id.* at ¶ 7]. Tek84 President Kevin Russeth sits on the Videray Board of Directors. [Doc. No. 17-7 at 2]. Tek84 is also a distributor of Videray's products, including the Accused Products. [*Id.*].

Viken is a Delaware corporation with its principal place of business in Massachusetts. [*Id.* at ¶ 8]. It is the current assignee and owner of the Patents at Issue. [*Id.* at ¶¶ 9-11]. The '195 Patent issued on September 8, 2020, was filed on April 5, 2018, and has an effective filing date of April 5, 2017. [*Id.* at ¶ 35]. The '998 Patent is a continuation application of the '195 Patent; it was issued on December 14, 2021, was filed on July 22, 2020, and has an effective filing date of April 5, 2017. [*Id.* at ¶ 48]. The '706 Patent is a continuation application of the '998 Patent, which is a continuation application of the '195 Patent; it was issued on October 3, 2023, was filed on November 15, 2021, and has an effective filing date of April 5, 2017. [*Id.* at ¶ 64]. The claims of the Patents at Issue recite an x-ray chopper wheel assembly. [*Id.* at ¶¶ 35, 39-40, 48, 52-54, 64, 68]. The '706 Patent claims also recite a method of limiting x-ray leakage from an x-ray chopper wheel assembly. [*Id.* at ¶¶ 69-71].

### B.  Prior Lawsuits

Prior to the current suit, Viken and Videray were opposing parties in two related federal cases ("the Federal Actions"). In March 2019, Viken sued Videray and Paul Bradshaw, a former employee of Viken and the current President and CEO of Videray, alleging trade secret misappropriation. [*Id.* at ¶¶ 19-20]. The complaint accused Bradshaw of using Viken's confidential information and trade secrets to start a competing company and develop a competing product, marketed and offered for sale by Videray as "Videray PX1." [Doc. No. 17-1].

In September 2019, Viken and Peter Rothschild, the founder and Chief Technical Officer of Viken, brought a second suit against Bradshaw. [Doc. No. 1 at ¶¶ 21-22]. This suit alleged that Bradshaw gained unauthorized access to Rothschild's electronic file storage and planted files to falsely support a purported "unclean hands" defense. [Doc. No. 17-3].

On October 2, 2020, Viken, Rothschild, Videray and Bradshaw entered into the Agreement to resolve the Federal Actions. [Doc. No. 1 at ¶ 23]. Section 6 of the Agreement states in relevant part:

> **General Release of Mr. Bradshaw and Videray.** . . . Viken and Dr. Rothschild, for themselves and their respective affiliates, predecessors, successors, parents, subsidiaries, assigns, shareholders, owners, officers, trustees, directors, agents, insurers, attorneys, representatives and employees (referred to in this section as "Releasors") hereby release, remise covenant not to sue, and forever discharge . . . Videray and its affiliates, predecessors, successors, parents, subsidiaries, assigns, shareholders, owners, officers, trustees, directors, agents, insurers, attorneys, representatives and employees ("Videray Releasees") of and from all claims, acts, debts, demands, actions, causes of action, suits, counterclaims, dues, sums of money, accounts, reckoning, judgments, covenants, contracts, controversies, agreements, promises, representations, damages and liabilities whatsoever of every name and nature, both in law and equity, known or unknown, which against . . . the Videray Releasees the Releasors ever had, now have or may have. from the beginning of the world to the date of this Agreement, including without limitation those which relate in any way to or arise out of the Federal Actions.

[Doc. No. 17-5 at 4-5; Doc. No. 1 at ¶ 25].

3

On October 5, 2020, the parties voluntarily stipulated to the dismissal of the Federal Actions with prejudice. [Doc. No. 1 at ¶ 27].

### C. **Pre-Suit Correspondence**

On June 24, 2022, Viken sent a cease-and-desist letter ("the First Demand Letter") to Tek84 alleging infringement of the '195 and '998 Patents, specifically, any "distributing, using, selling, offering to sell, importing, or exporting the PX1, or any substantially similar product." [Doc. No. 1 at ¶ 28; Doc. No. 17-8 at 3]. The First Demand Letter also alleged false representations in marketing materials of the PX1. [Doc. No. 17-8 at 3].

On August 10, 2022, Tek84 responded to Viken (the "Response Letter") contending that Viken's claims against Tek84 are barred by the Settlement Agreement. [Doc. No. 1 at ¶ 29; Doc. No. 17-6 at 2]. Additionally, Tek84 asserted non-infringement and invalidity of the '195 Patent and '998 Patent, and further denied that Tek84 had made false claims regarding the PX1. [Doc. No. 17-6 at 4, 8-10].

On September 19, 2023, about fifteen months after the First Demand Letter, Viken sent another letter (the "Second Demand Letter") to both Tek84 and Videray, claiming the Accused Products infringe the '195, '998, and '706 Patents. [Doc. No. 1 at ¶ 30; Doc. No. 17-9 at 2].

### D. **Procedural History**

On December 8, 2023, Videray and Tek84 filed suit against Viken, requesting the Court to declare that the Accused Products have not infringed and do not infringe the Patents at Issue; declare invalid the claims of the Patents at Issue; and declare that Viken's claims as asserted in the First Demand Letter and Second Demand Letter are barred by the Agreement, and further find that Viken breached the Agreement by issuing such correspondence. [Doc. No. 1 at 20-21].

On February 19, 2024, Viken moved to dismiss the First Cause of Action (declaratory judgment of non-infringement of the '195 Patent) as to Videray, the Fourth Cause of Action (declaratory judgment of invalidity of the '195 Patent) as to Videray, the Seventh Cause of Action (declaratory judgment regarding the Agreement), and the Eighth Cause of Action (breach of the Agreement). [Doc. No. 16]. The matter was fully briefed, and a hearing was held on July 17, 2024. [Doc. No. 29].

## II.    STANDARD

In evaluating a Rule 12(b)(6) motion to dismiss, the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiff[], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)).  The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

Settlement agreements are generally governed by contract interpretation law. *See HipSaver Co. v. J.T. Posey Co*., 490 F. Supp. 2d 55, 63 (D. Mass. 2007). In Massachusetts, initial contract interpretation is a question of law. *Baybank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F. Supp. 957, 963 (D. Mass. 1991) (citations omitted). Generally, contracts "should be construed where possible to give effect to every term and phrase." *HipSaver Co. v. J.T. Posey Co.,* 490 F. Supp. 2d 55, 62 (D. Mass. 2007) (quoting *United States v. Alegria*, 192 F.3d 179, 185

(1st Cir. 1999)). "When a contract is unambiguous, the interpretation of such a contract is left to the court." *Alternative Energy, Inc. v. St. Paul Fire and Marine Insurance Co*., 267 F.3d 30, 35 (1st Cir. 2001). An unambiguous contract must be enforced according to its plain terms. *Freelander v. G. & K. Realty Corp*., 357 Mass. 512, 516 (1970). However, if the court determines the contract is ambiguous, the interpretation becomes a question of fact. *Gillentine v. McKeand,* 426 F.2d 717, 721 (1st Cir. 1970). "To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 783 (1st Cir. 2011) (cleaned up). "[A] contract is only ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Id.*

## III.    ANALYSIS

### A.    <u>Whether Tek84 Is A Released Party To The Settlement Agreement, And If Not, Whether It Is Nevertheless Protected By An Implied License</u>

Viken challenges the Seventh Cause of Action relative to any claims asserted against Tek84 in pre-suit correspondence, on the basis that the Agreement does not release future affiliates, shareholders, owners, and/or successors. I agree with Viken and find that the plain language of the Agreement unambiguously does not release claims against Tek84. However, I also find that the Complaint plausibly alleges that Tek84 is a downstream distributor protected from patent infringement liability via the Agreement's grant of an implied license to the Patents at Issue.[1] Accordingly, the motion to dismiss the Seventh Cause of Action as to Tek84 is denied to the extent that Tek84 is deemed a downstream distributor, but allowed to the extent that Tek84

---

[1] Given my discussion below, *infra* at 16 n.5, with regard to the yet-to-issue '998 and '706 Patents, it may be that the implied license is limited to the '195 Patent.

is deemed an upstream developer or manufacturer of products that infringe on the Patents at Issue.

      1.   **Tek84 is not a released party as the Agreement did not cover future affiliates, shareholders, owners, or successors.**

Plaintiffs must have pleaded that Tek84 was an affiliate, shareholder, owner, and/or successor of Videray at the time of the Agreement; entities that gained such status post-Agreement are not covered by the Agreement. In reaching this conclusion, the *Unova* case is instructive. There, Unova and Compaq entered into a settlement agreement stating that Unova "hereby releases Compaq, its parents, and its Subsidiaries" from all claims that relate to "an allegation of infringement of any of the Smart Battery Patents based in whole or in part on any act, event, occurrence, transaction, or omission which took place on or before [May 4, 2001]." *Unova, Inc. v. Acer Inc.*, 363 F.3d 1278, 1282 (Fed. Cir. 2004). Subsequently, "Hewlett-Packard acquired 100% of the capital stock of Compaq and thus became Compaq's parent." *Id*. at 1280. The Federal Circuit found that the release applied only to Compaq's parents at the time of settlement, stating:

> Hewlett–Packard was not Compaq's parent on [the date of the release] and, as a consequence, is not entitled to the benefit of the release. . . . [W]e will not interpret the release provision contrary to the plain meaning of its language or contrary to common sense. The release provision is *written in the present tense*—"Unova . . . hereby releases Compaq, its parents, and its Subsidiaries"—and *refers to acts of past infringement*; thus, it most naturally does not refer to Compaq's future parents.

*Id*. at 1282 (emphases added).

So too here. The Settlement Agreement is written in the present tense: "Viken and Dr. Rothschild . . . hereby release, remise, covenant not to sue, and forever discharge . . . Videray and its affiliates, predecessors, successors, parents, subsidiaries, assigns, shareholders, owners," and so forth. The present tense language, absent other language indicating an intent to bind future parties, indicates that the Agreement releases only those affiliated with Videray at the time of the

Agreement. *See also, e.g.*, *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001) ("The Release's reference to 'affiliates' . . . [is] stated in the present tense. Nothing . . . indicates the inclusion of future rather than present members." Further, the parties were, as here, "sophisticated commercial actors who could have specifically referred to future member clubs had they intended to include them in the Release."); *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 246 (2014) ("Absent explicit language demonstrating the parties' intent to bind future affiliates of the contracting parties, the term 'affiliate' includes only those affiliates in existence at the time that the contract was executed."). Contrary to Plaintiffs' assertion, the mere inclusion of "successors" in the list of covered releasees does not inherently render the Settlement Agreement a future-looking document. Where successor is but one of many relationship categories recited, and each is referred to in the present tense, the Agreement is most sensibly read as referencing those holding successor status at the time of the Agreement.

And, as in *Unova*, the Agreement limits the release against future claims and acts. *See Unova*, 363 F.3d at 1282 (Where a release "refers to acts of past infringement; . . . it most naturally does not refer to [] future parents."). The Agreement here plainly states that Viken released "all claims, acts, debts, demands, actions . . . known and unknown, which against the . . . Videray Releasees the Releasors ever had, now have or may have *from the beginning of the world to the date of this Agreement*." On its face, the release excludes claims and acts that did not exist until after the date of the Agreement (as I explain below, *infra* at 12-16)—which leads to two inferences. First, where only *past* claims and acts are covered, the Agreement "most naturally does not refer" to Videray's *future* affiliates or shareholders. *Unova*, 363 F.3d at 1282. Second, the inclusion of the limiting phrase – "from the beginning of the world to the date of this Agreement" – demonstrates that the contracting parties could and would set temporal limitations

when intended. They could have included language indicating that future affiliates or shareholders would be covered by the release, but apparently chose not to.[2]

Plaintiffs argue that Massachusetts law requires general releases to be broadly construed, as Massachusetts courts "have a policy in our Commonwealth of giving effect to general releases, even if the parties did not have in mind at the time all of the matters that might be covered." [Doc. No. 25 at 9 (quoting *MacDonald v. Jenzabar, Inc.*, 92 Mass. App. Ct. 630, 636 (2018)]. While true, courts may only give effect to what is contained within the release. I will not add meaning or interpret terms that would contradict what is plain—the Agreement does not cover future shareholders, affiliates, owners, or successors.

Turning to the facts at hand, as pleaded, Tek84 is shareholder and investor of Videray, as well as a distributor of Videray products, including the Accused Products. The Complaint contains no other allegation regarding Tek84's relationship to Videray. It does not state when Tek84 became a shareholder, investor, and distributor of Videray. It does not detail to what extent Tek84 is a shareholder and investor of Videray—e.g., how many shares it owns—or to what extent Tek84 influences or controls Videray's operations. In correspondence between the parties referred to in the Complaint, Plaintiffs' counsel references a press release of December 14, 2021, wherein Tek84 "announced that it has made a significant strategic equity investment in Videray" and "has also provided working capital funding to Videray," and that "Tek84 President Kevin Russeth has been appointed to the Videray Board of Directors while Videray Chief Executive

---

[2] *Compare Unova*, 363 F.3d at 1282 (concluding release did not cover future parents where the contracting parties "elsewhere referred to future entities . . . when they so intended, and the fact that they did not similarly modify the term 'parents' suggests that they did not seek to release Compaq's future parents"), *with Oyster Optics, LLC v. Infinera Corp.*, 843 F. App'x 298, 301 (Fed. Cir. 2021) (Where an agreement expressly defined "affiliate" as including entities having control of a company "now or in future," the "contention that the agreement only applies to those who were 'Affiliates' as of the effective date of the license flies in the face of the plain language of the Agreement.").

Officer and founder Paul Bradshaw will continue to lead the company." [Doc. No. 17-7 at 2]. As currently pled, the Complaint does not sufficiently allege that Tek84 was a shareholder, affiliate, owner, and/or successor of Videray at the time of the Agreement.[3] The referenced documents to the Complaint indicate that, even if Plaintiffs were permitted to amend the Complaint, Tek84's affiliation with Videray commenced on December 14, 2021—well after the Agreement's execution. And, in any event, as pled, Tek84 is not a successor under Massachusetts law, which requires that an entity "must be a successor to all, or substantially all, of another corporation's assets" to be deemed a successor corporation. *Premier Capital, LLC v. KMZ, Inc.*, 464 Mass. 467, 475 (2013). On these grounds, Tek84 is not a released party under the Agreement.

### 2.  The Complaint plausibly alleges that the Agreement protects Tek84 from patent infringement liability through an implied license.

Plaintiffs alternatively assert that the Agreement grants Videray an implied license to Viken's patents, thereby benefitting Tek84 as Videray's downstream distributor.

"In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention." *Wang Lab'ys, Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997) (citation omitted). Implied licenses may "arise by acquiescence, by conduct, by equitable estoppel (estoppel in paid), or by legal estoppel." *Id.*; *see also De Forest Radio Telephone & Telegraph Co. v. United States*, 273 U.S. 236, 241 (1927) ("No formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent or any conduct on his part exhibited to another, from

---

[3] Plaintiffs additionally state in their briefing (but not in the Complaint) that Tek84 is "Videray's largest and controlling shareholder, and a distributor of the PX1," and that "Tek84 is an affiliate of Videray, currently owns all preferred shares of Videray, owns half of all voting shares in Videray, and is, thus, a successor of Videray based on its stock purchases." [Doc. No. 25 at 7, 10]. Even if I were to consider these additional statements, it merely states that Tek84 is *currently* a shareholder, investor, distributor, and affiliate.

which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license, and a defense to an action for a tort."). Whether the implied license defense applies is a question of law. *Endo Pharm. Inc. v. Actavis, Inc.*, 746 F.3d 1371, 1374 (Fed. Cir. 2014). "There is a two-pronged test for determining whether an implied license has been granted: 'First, the equipment involved must have no noninfringing uses .... Second, the circumstances of the sale must plainly indicate that the grant of a license should be inferred.'" *Trustees of Columbia Univ. in City of New York v. Roche Diagnostics GmbH*, 272 F. Supp. 2d 90, 114 (D. Mass. 2002) (quoting *Met–Coil Systems Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 686 (Fed. Cir. 1986)). In the patent context, courts have "emphasized the relevance of parties' entire course of conduct to the determination of whether an implied-in-fact license exists." *Bitmanagement Software GmBH v. United States*, 989 F.3d 938, 947 (Fed. Cir. 2021) (citing *Wang Lab'ys*, 103 F.3d at 1580).

Plaintiffs point to *Press Mach. Corp. v. Smith R.P.M. Corp.*, 727 F.2d 781, 785 (8th Cir. 1984) for its holding that in an agreement releasing trade secrets claims, it also necessarily granted an implied license which released related patent infringement claims. There, at summary judgment, the court limited the license to the single unit of the product that gave rise to the trade secret case, finding that "the settlement agreement was intended to allow PMC to continue manufacturing, marketing and installing its conversion system at the Kansas City Star." *Id.* at 786. Plaintiffs have plausibly alleged that, in releasing all pre-Agreement claims and acts, Viken released its patent infringement claims against Videray. *See infra* at 12-16. Such a release would similarly grant Videray an implied license. Viken counters that any implied license here likewise would be limited, to only the PX-1 units that existed at the time of the Agreement. This could very well be true. But the scope of the alleged license is not relevant at this juncture. It suffices

for now to find a sufficiently pleaded allegation that there was an implied license granted to

Videray, from which Tek84 may benefit as a downstream distributor.[4] But as it is currently pled,

to the extent that Tek84 develops or manufactures products and it is alleged that those products

infringe on the Patents at Issue, Tek84 cannot benefit from any such implied license.

**B. Seventh And Eighth Causes Of Action As To Both Videray And Tek84 And The "Yet-To-Issue" '998 And '706 Patents**

Viken asserts that the Seventh and Eighth Causes of Action fail to state a claim on the

basis that the Agreement does not release the '998 and '706 Patents, as these patents did not exist

until after the date of the Agreement. Plaintiffs argue the opposite, that because Viken released

all claims it knew it "may have" as of the Agreement, this includes potential patent claims that

may (and that Viken knew would) issue in the future. I find that the Complaint sufficiently states

a claim as to the '998 and '706 Patents, but on a different basis than Plaintiffs propose.

In relevant part, the Agreement provides that Viken releases Videray:

> of and from all claims, acts, debts, demands, actions, causes of action, suits, counterclaims, dues, sums of money, accounts, reckoning, judgments, covenants, contracts, controversies, agreements, promises, representations, damages and liabilities whatsoever of every name and nature, both in law and equity, known or unknown, which against . . . the Videray Releasees the Releasors ever had, now

---

[4] Regarding the license's effect on Tek84, Plaintiffs' reliance on *TransCore* is misplaced. *See TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009) (finding that "the parties' intent with respect to *downstream* customers is of no moment in a patent exhaustion analysis," as opposed to an implied license analysis). Nevertheless, "[i]n the usual case, the manufacturer or upstream user has obtained a license to make and sell a patented product, and the license operates to protect downstream users who buy and use that product." *Aguayo v. Universal Instruments Corp.*, 356 F. Supp. 2d 699, 755 (S.D. Tex. 2005); *see also Kaneka Corp. v. SKC Kolon PI, Inc.*, No. CV1103397JGBRZX, 2015 WL 12697646, at *11 (C.D. Cal. Apr. 10, 2015) ("When a patentee grants a license to practice a patent without restriction, the law bars the patentee from asserting the patent against a purchaser of patented articles sold by the licensee."); *Jacobs v. Nintendo of Am., Inc.*, 370 F.3d 1097, 1101–02 (Fed. Cir. 2004) ("[I]t is unlikely that [Licensee] would have contracted for the right to manufacture and sell a product knowing that its customers would be unable to use the product that it sold them for the bargained-for purpose. Thus, we agree with the district court that the [Patentee]–[Licensee] settlement agreement grants to [Licensee]'s customers an implied sublicense to use [Licensee]'s accelerometers to make, use, and sell tilt-sensitive control boxes that infringe the 958 patent without interference by [Patentee].") The same logic applies to downstream parties generally, such that Plaintiffs plausibly allege that the implied license to Videray protects Tek84 as its downstream distributor.

12

> have or may have from the beginning of the world to the date of this Agreement,
> including without limitation those which relate in any way to or arise out of the
> Federal Actions.

[Doc. No. 17-5 at 4-5]. Plaintiffs argue that "the phrase 'may have' is 'necessarily future-oriented' and 'implies a future possibility' of a defendant having a claim." [Doc. No. 25 at 18 (quoting *Augustine Med., Inc. v. Progressive Dynamics, Inc*., 194 F.3d 1367, 1371 (Fed. Cir. 1999)]. But such an interpretation would fail to give meaning to all the Agreement's provisions—namely, that the Agreement releases those claims that Viken "may have from the beginning of the world *to the date of this Agreement*." *See MIT Fed. Credit Union v. Cordisco*, 470 F. Supp. 3d 81, 85 (D. Mass. 2020) ("It is settled law in all jurisdictions . . . that courts should interpret a contract to give meaning to all of its provisions."). Taken as a whole, the Agreement unambiguously limits its release to claims that existed up to the date of the Agreement, as opposed to claims that came into existence following the Agreement.

But Viken's interpretation similarly misses the mark, where it erroneously focuses on one aspect of the Agreement while ignoring another. Viken asserts that the Agreement was "limited to claims that existed 'to the date of this Agreement." [Doc. No. 17 at 16]. However, the Agreement releases not only "claims," but also "acts" preceding the Agreement—i.e., "all claims, [*and*] acts . . . from the beginning of the world to the date of this Agreement." [Doc. No. 17-5 at 4-5].

The *Augustine* case illustrates the significance of this distinction. There, the two parties executed a settlement agreement stating, "[Augustine] does hereby . . . release and forever discharge [Progessive] from any and all manner of action or actions . . . that [Augustine] and/or its owners . . . have, have had, or may have against [Progressive] upon or by reason of or relating to any acts, omissions or statements made by [Progressive] on or before the date of this Settlement Agreement." *Augustine*, 194 F.3d at 1371. Based on this language, the Federal Circuit held that the agreement unambiguously releases claims arising after the date of the agreement,

but only "as long as the claims were related to acts that were taken on or before the date of the Settlement Agreement." *Id.* On the other side of the coin, then, claims that arise after the date of the agreement and relate to acts taken after the agreement are not released. As Viken itself points out, the court so concluded because the time limitation as written in the release modified acts— i.e., releasing all "actions" that Augustine "may have . . . relating to any acts, omissions or statements made by [Progressive] on or before the date of this Settlement Agreement"—and not the claims or actions themselves. *Id.*

And in *Augustine*, the settlement agreement arose from Augustine's unfair competition lawsuit regarding Progressive's product, a warming blanket. It was "undisputed that patent infringement was not part of this [underlying] lawsuit." *Id.* at 1369. The subsequent lawsuit alleged patent infringement, wherein the accused product was Progressive's warming blanket "in a materially identical form" as prior to the execution of the settlement agreement. *Id.* at 1370. As Viken notes, "Because Progressive was producing the accused product prior to the settlement agreement, future patent infringement of that product was 'related to' pre-settlement acts that infringed the same patents." [Doc. No. 17 at 18]. In other words, Augustine's claims for patent infringement in the present litigation were sufficiently related to Progressive's pre-settlement agreement actions such that they were released.

Alternatively, a court in this District has read a similar provision releasing "any and all claims" to release "claims related to . . . *conduct* that occurred" pre-agreement, as opposed to requiring the claims to occur pre-agreement. *Armstrong v. White Winston Select Asset Funds, LLC*, 648 F. Supp. 3d 230, 250 (D. Mass. 2022) (emphasis added). In *Armstrong*, the court considered an agreement stating that "the Armstrong Parties release WW from any and all claims, counterclaims, demands, actions and causes of action of any nature whatsoever, whether

at law or in equity . . . that the Releasing Parties, or any of them, have or may have against the Released Parties, whether or not known to them, from the beginning of the world to the date of this Agreement." *Id.* Based on the plain language of the release, the court held, "The unambiguous terms of the [agreement] therefore establish that the Armstrong Parties have released any claims related to WW's conduct that occurred prior to the execution of the [agreement]." *Id.* It went on to emphasize that the agreement "*only* protects WW from claims associated with conduct that occurred before the execution of the [agreement]," as opposed to post-release claims. *Id.* at 251 (emphasis added). Similarly, even excluding "acts" and focusing on "claims" alone, the Agreement here releases "claims associated with conduct that occurred before the execution" of the Agreement. *Id.*

The question, then, is whether the Plaintiffs have sufficiently alleged that Viken's patent infringement claims relate to Videray's pre-Agreement conduct such that they are released. The Complaint sets forth that the parties "entered into the Settlement Agreement to resolve the Federal Actions and all claims by Viken and Rothschild against Videray and Bradshaw related to the PX1." [Doc. No. 1 at ¶ 23]. The Agreement was executed on October 2, 2020. [*Id.* at ¶¶ 23-24]. Of the Patents at Issue, the '195 Patent issued prior to the Agreement, and the '998 Patent was filed prior to the Agreement, [*id.* at ¶¶ 35, 48]; the '998 and '706 Patents are continuations of the '195 Patent, [*id.* at ¶¶ 48, 64]. Viken has now asserted that Videray's products, the PX1 and PX Ultra, infringe the Patents at Issue. [*Id.* at ¶¶ 1-2, 28-30]; *see also* [Doc. Nos. 17-8, 17-9]. The PX1 and the PX Ultra are both described as "hand-held x-ray backscatter imaging devices used by law enforcement and other customers in the safety & security market, as well as for Non-Destructive Testing ("NDT") applications in various industrial and commercial markets" [Doc. No. 1 at ¶ 4]; in other words, they appear to be "materially identical." *See Augustine*, 194

F.3d at 1370. Based on these allegations, the Complaint plausibly states a claim for which relief can be granted—that any claims by Viken for patent infringement are sufficiently related to Videray's pre-Agreement actions and are released under the Agreement.[5]

Putting aside the time limitation provision, Viken also argues that the patent infringement claims cannot be released because they do not relate to the Federal Actions. To the extent that this argument has any merit (though such a conclusion is dubious)[6], the Agreement releases "all" claims and acts, "including without limitation those which relate in any way to or arise out of the Federal Actions." [Doc. No. 17-5 at 5]. But it does not expressly limit the release to *only* those which relate to the Federal Actions. Reading the general release broadly, as required by Massachusetts law, *see MacDonald*, 92 Mass. App. Ct. at 636, the Agreement releases all claims and acts up to the date of the Agreement—regardless of their relatedness to the Federal Actions. *Cf. Diversified Dynamics Corp. v. Wagner Spray Tech Corp.*, 106 F. App'x 29, 33 (Fed. Cir. 2004) (distinguishing agreement in Augustine, which broadly released "all claims based on any acts or omissions before a given date," from subject agreement which was "narrowly tailored to actions arising out of or related to one particular patent").

Accordingly, the Seventh and Eighth Causes of Action may proceed with respect to the '998 and '706 Patents.

---

[5] Continuation patents are distinct legal entities, though they might share the same specifications as the parent patent. Continuation patents may contain different claims, which may be narrower, broader, or otherwise modified from the original. To the extent that the claims at issue in the '998 and/or the '706 Patents are identical to the claims that were at issue in the '195 Patent at the time of the Agreement, Plaintiffs may be entitled to the requested declaratory relief. But to the extent that the claims in the '998 or the '706 Patent are somehow different from the '195 claims, Viken potentially has valid grounds to allege infringement.

[6] *See, e.g.*, as discussed *supra* at 11, *Press Mach. Corp.*, 727 F.2d at 785 (holding that agreement releasing claims "arising out of, resulting from or in any way pertaining to the agreements and matters referred to in [the pleadings of the trade secret litigation]" also released related patent infringement claims).

C. **The First, Fourth, Seventh And Eighth Causes Of Action As To Videray And The '195 Patent**

Finally, Viken asserts that the First, Fourth, Seventh, and Eighth Causes of Action as to Videray and the '195 Patent fail to state a claim because Viken "never accused Videray of infringing the '195 [P]atent and therefore there is no case or controversy between the parties with respect to that patent." [Doc. No. 17 at 19-20]. Ripeness requires a showing of "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of" the judicial relief sought. *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (cleaned up). "[J]urisdiction does not turn on whether the patentee specifically communicated with the declaratory judgment plaintiff. . . . Instead, the relevant inquiry is whether the patentee's actions can be reasonably inferred as demonstrating intent to enforce a patent." *UCP Int'l Co. Ltd. v. Balsam Brands Inc.*, 787 F. App'x 691, 700 (Fed. Cir. 2019) (cleaned up). "[T]he issue of whether there has been meaningful preparation to conduct potentially infringing activity remains an important element" as well, in a declaratory judgment jurisdiction analysis. *Id.* at 700-01 (quoting *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 880 (Fed. Cir. 2008)).

Further, courts have held that suppliers can file declaratory judgment actions where their customers are accused of infringement based on the supplier's product. *See, e.g.*, *Arris Grp., Inc. v. Brit. Telecommunications PLC*, 639 F.3d 1368, 1375 (Fed. Cir. 2011) ("When the holder of a patent with system claims accuses a customer of direct infringement based on the customer's making, using, or selling of an allegedly infringing system in which a supplier's product functions as a material component, there may be an implicit assertion that the supplier has indirectly infringed the patent."); *Nat'l Coupling Co. v. Press–Seal Gasket Corp.*, 323 F.2d 629, 630, 632–33 (7th Cir. 1963) (actual controversy existed where defendant "charged contributory

infringement" by sending plaintiff's customer a letter alleging that plaintiff's product, when installed in a certain manner, infringed defendant's device); *Nippon Elec. Glass Co., Ltd. v. Sheldon,* 489 F. Supp. 119, 122 (S.D.N.Y. 1980) ("Once defendant accused Sony and Panasonic of direct infringement due to their use of plaintiff's product, plaintiff had reason to fear that it could be sued as a contributory infringer. It, therefore, was entitled to seek declaratory relief, . . . even though defendant ha[d] not yet directly charged plaintiff with contributory infringement."). Likewise, a manufacturer would have reason to fear that it could be sued for infringement, based on an accusation of infringement made to its supplier regarding its manufactured product.

On June 24, 2022, Viken sent a letter to Tek84 alleging that "Videray Technologies' PX1 handheld scanner . . . infringes at least claim[] 22 of the '195 [P]atent," and stating that it would "vigorously protect Viken's intellectual property rights, all of which are expressly reserved, including pursuit of injunctive relief, lost profits, punitive damages, and attorneys fees." [Doc. No. 17-8 at 2-4]; *see* [Doc. No. 1 at ¶ 28]. In the same letter, Viken wrote that the PX1's "marketing materials contain false representations of the products' capabilities" and attached Videray's said marketing materials to the letter. [Doc. No. 17-8 at 3, 48]. On August 10, 2022, Tek84's counsel responded:

> I write . . . regarding your June 24, 2022 letter relating to certain Videray Technologies' products. Viken's letter alleges that the Videray PX1 handheld scanner infringes claims 22 of U.S. Patent No. 10,770,195 ("the '195 Patent") and claim 1 of U.S. Patent No. 11,200,998 ("the '998 Patent"). Viken's claims . . . are both improper and barred by Viken's past actions.

[Doc. No. 17-6 at 2]; *see* [Doc. No. 1 at ¶ 29]. On September 19, 2023, in a letter addressed to both Tek84 and Videray, Viken stated that "Tek84 and Videray are willfully infringing Viken's intellectual property rights." [Doc. No. 17-9 at 8]; *see* [Doc. No. 1 at ¶ 30]. Based on these statements, and others exchanged in the parties' pre-litigation correspondence, the Complaint plausibly alleges that Viken's actions can be reasonably inferred as demonstrating intent to

enforce the '195 Patent against Videray, thus creating a case and controversy with respect to that patent.

**IV.    CONCLUSION**

For the reasons above, Viken's Motion to Dismiss the Seventh Cause of Action is <u>GRANTED</u> to the extent that Tek84 is deemed an upstream developer or a manufacturer of products that infringe the Patents at Issue, but the motion is otherwise <u>DENIED</u> in all other respects.

SO ORDERED.

/s/ Myong J. Joun
United States District Judge